UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

——————————————————x

| | |
|---|---|
| STEVEN WYNN, ELAINE WYNN,<br>WYNN RESORTS LIMITED AND<br>WYNN RESORTS L.L.C. | :<br>:<br>: |
| | : |
| Plaintiffs, | : |
| | : |
| v. | : |
| | : |
| LEXINGTON INSURANCE<br>COMPANY, and<br>ALLIED WORLD ASSURANCE<br>COMPANY (US), INC., | :<br>:<br>:<br>: |
| Defendants. | : |

Civil Action No. 07 CV 7604 (NRB)(MHD)

**FIRST AMENDED COMPLAINT**

**JURY TRIAL DEMANDED**

——————————————————x

Plaintiffs, Steve Wynn, Elaine Wynn (collectively referred to herein as
"Owners"), Wynn Resorts Limited ("Wynn Ltd.") and Wynn Resorts L.L.C. ("Wynn LLC")
(the Owners, Wynn Ltd., Wynn LLC are collectively referred to herein as "Wynn" or
"Plaintiffs"), by and through their undersigned attorneys, Buchanan Ingersoll & Rooney PC,
hereby bring this action against defendants, Lexington Insurance Company ("Lexington") and
Allied World Assurance Company (US) Inc. ("Allied") (Lexington and Allied are collectively
referred to herein as "Defendants") and allege as follows:

**INTRODUCTION**

1.      Plaintiffs were forced to bring this action due to Defendants' fraudulent
misrepresentations about their obligations under certain all-risk insurance policies purchased
by Plaintiffs and their unjustifiable and bad faith refusals to provide Plaintiffs with the
bargained-for benefits under those policies.  The policies indemnified Plaintiffs against all
losses to an apartment located at 817 Fifth Avenue, New York, New York resulting from
certain specified perils, including but not limited to, flooding.

2.     In reliance on the Defendants' representations about the scope of coverage, Plaintiffs proceeded to pay exorbitant premiums to Defendants in the amount of over $100,000.00 per year for insurance coverage on the Manhattan apartment and the expensive furnishings, personal property, and improvements contained therein.

3.     After a massive flood destroyed or damaged beyond repair much of the apartment and its contents, Defendants have, in bad faith and without justification or excuse, purported to limit their obligations to indemnify Plaintiffs to a mere fraction of the actual cost of restoring the apartment to its pre-flood condition and related extra expenses.  Meanwhile, Plaintiffs, in reliance on Defendants' misrepresentations, forbore immediate renovation and reparation of the damaged interior and furnishings, causing them to suffer further damages from loss of use, loss of business income, increased extra expenses covered under the policies and possible increased deterioration of the apartment and its furnishings.  Defendants' persistence in their bad faith and wrongful denial of coverage has left Plaintiffs with no choice but to initiate this present action.

**THE PARTIES**

4.     Plaintiffs, Wynn LLC and Wynn Ltd., are Nevada limited liability companies with a principal place of business located in Nevada.

5.     The Owners own shares and are the leaseholders under a proprietary lease in a cooperative apartment building locating at 817 Fifth Avenue, New York, New York (the "Apartment").  This Apartment serves as the Owners' residence and place of business when they are in New York.

6.     Defendant, Lexington is a corporation organized and existing under the laws of Delaware and maintaining administrative offices at 100 Summer Street, Boston,

Massachusetts 02110 and its principal place of business at 200 State Street, Boston, Massachusetts 02109.

7.      Defendant, Lexington is a member company of American International Group ("AIG") and AIG set, created and influenced internal policies on payment and adjustment of claims.

8.      Defendant, Allied is a Bermuda corporation maintaining its corporate headquarters at 27 Richmond Road, Pembroke HM 08, Bermuda and a United States headquarters located at 225 Franklin Street, 27th Floor, Boston, Massachusetts 02110.

9.      Defendant, Allied was founded in large part by AIG.

10.     AIG was a principal shareholder of defendant Allied and contributed a significant amount of capital toward Allied's creation and influenced and created Allied's internal policies on payment and adjustment of claims.

11.     At all relevant times, Lexington provided all-risk property insurance coverage on the Apartment, as well the furnishings, personal property, and improvements contained therein to Plaintiffs against certain perils, including but not limited to flooding.

12.     Allied provided all-risk property insurance coverage to Plaintiffs on the Apartment, and its furnishings, personal property, and improvements contained therein against certain specified perils, including but not limited to, flooding.

13.     At the time Defendants provided coverage for Plaintiffs for the Apartment, they knew that the Apartment was lavishly and extravagantly furnished and renovated and that the Plaintiffs sought insurance for high-end and custom-made furnishings, personal property, and improvements.  Indeed, the Defendants were provided with a list of the covered items and their estimated minimum values at the time they issued their policies to Plaintiffs.

Thus, there can be no question that the Defendants were aware of the opulence of the Apartment and the value of its contents and that it would be extremely expensive to replace or repair any item destroyed or damaged as a result of a covered peril.

## STATEMENT OF FACTS

### THE POLICIES

14.     For the coverage period of June 22, 2004 through June 22, 2005, Lexington issued ALL RISK INCLUDING FLOOD Insurance Policy No. 1374229 to Wynn Ltd.  (*See* the Lexington policy attached as Exhibit "A" and, at times herein, is referred to as the "Lexington Policy").

15.     For the coverage period of June 22, 2004 through June 22, 2005, Allied issued ALL RISK INCLUDING FLOOD Insurance Policy No. AW1374229 to Wynn LLC.  (*See* the Allied policy attached also as Exhibit "B" and, at times herein, is referred to as the "Allied Policy").

16.      The Lexington and Allied Policies share the risk of insuring the Apartment, and its contents, as well as extra expenses such as loss of business income or other damages resulting from certain perils, including flooding (collectively herein referred to as the "Policies").  The Policies were delivered to Nevada, where the primary insureds are principally located.

17.     Under the Policies, Defendants are unquestionably obligated to provide insurance coverage to Wynn for any covered losses to the Apartment, inclusive of losses arising from flood damage, up to an amount of $65,140,787.00.

18.     In reliance on the Defendants' representations about the scope of coverage, at all relevant times, Wynn paid the annual premium of over $100,000.00 under the Policies.

19.    Defendants accepted the premium payments, bound the coverage and, upon information and belief, earned investment or interest income on Wynn's premiums. During this time, Wynn had no reason to suspect that Defendants had no intention of ever paying the full amount of coverage owed under the Policies in the event of a claim.

## THE FLOOD

20.    On or about December 29, 2004, a water pipe in the ceiling of the Apartment burst, causing substantial damage to the furnishings and infrastructure of the Apartment (herein the "Flood"), including total destruction of some items and locations therein.

21.    Due to the extensive damage sustained to the property and improvements in the Apartment, the Owners were unable to repair completely or satisfactorily the vast majority of the affected items. The Owners thus had no choice but to expend a considerable sum to replace these damaged items and incur extra expenses while conducting business in Manhattan.

22.    Moreover, the Flood was the direct and proximate cause of widespread structural damage to the Apartment's walls, ceiling and floors, damage that required extensive renovations and remediation to restore the Apartment to its pre-Flood condition.

## DEFENDANTS' WRONGFUL DENIAL OF THE CLAIM

23.    The Plaintiffs duly submitted documentary evidence of the out-of-pocket costs and other expenses incurred in excess of $3 million to repair and remediate the damaged portions of the Apartment's infrastructure, remove and replace the high-end furnishings and adornments, including but not limited to custom-made wall coverings and carpet, and to restore the Apartment to the opulence and splendor it enjoyed prior to the Flood.

24.    In addition, Wynn intends to demonstrate at trial additional and consequential damages relating to the loss of use of the Apartment, including but not limited to reasonably foreseeable loss of income from the prolonged inhabitability of the Apartment, the extra expenses incurred, attorney, consulting, appraisal and engineering fees, costs, and expenses, and possibly increased deterioration of the Apartment from the Defendants' dilatory actions and inaction.  Defendants knew or should have known and foreseen that Plaintiffs would suffer these and other expenses and damages stemming from Defendants' clear breach of their obligations arising under the policy.

25.    Despite Plaintiffs' submission to Defendants of evidence of the out-of-pocket damages resulting from the Flood and detailed information of Plaintiffs' claims, Defendants have wrongfully and improperly refused to honor their contractual liability under the Policies.

26.    Specifically, Defendants wrongfully and unjustifiably delayed and failed to indemnify Wynn for the full amount necessary to restore the Apartment to its pre-Flood condition, let alone for covered extra expenses relating to the Flood and have improperly and wrongly sought to settle the insurance claim for a sum far below the actual and fair value of the loss.

27.    The improper and fraudulent conduct of Defendants caused the Plaintiffs to delay renovation in the expectation that payment on the claims would be forthcoming, which it was not.  Plaintiffs' reasonable forbearance in remediation caused them to suffer increased damages and extra expense from the inability to utilize the Apartment for business or as a secondary residence.

28.    Defendants and Defendants' hired adjusters and representatives failed to follow standard industry practice and procedure in addressing Plaintiffs' claims.

6

29.    The fraudulent conduct engaged in by Defendants is part of a pattern of fraudulent conduct directed toward the public generally, wherein Defendants engage in a common scheme of marketing themselves, their policies, and coverage without intending to fully honor such representations in the event of a claim.

30.    Unsurprisingly, Defendants have been subject to numerous complaints and lawsuits involving similar misconduct and examples of Defendants' bad faith in dealing with their insureds, including but not limited to, other wrongfully-denied claims.  Among them, Defendants Lexington and Allied, and their parent company and/or sponsor AIG, are/have been defendants in the following cases and subject to the following complaints:

(i)    In *Hibbets, et al. v. Lexington Ins. Co.*, 07 CV 5169 (E.D.La),a class action lawsuit pending in the Eastern District of Louisiana, defendant Lexington is charged with systematically, intentionally, and improperly denying thousands of claims of policy owners relating to widespread damage from Hurricane Katrina.

(ii)    In *Carlisle SoHo East Trust v. Lexington Ins. Co.*, 2008 NY Slip Op 1847, 1 (1st Dept. 2008), Defendant Lexington is charged with wrongfully denying coverage under an umbrella insurance policy.

(iii)    In *Ruddy v. Lexington Ins. Co.*, Index No. 020736/2002 (2d Dep't), defendant is charged with wrongfully denying plaintiff sums due on a homeowners' insurance policy.

(iv)    In *Board of Managers of the 195 Hudson Street Condo. v. Jeffrey M. Brown Associates, Inc., et al.*, 07 CV 4058 (S.D.N.Y.): Plaintiff's complaint seeks declaratory judgment against defendant Lexington for its failure to pay on valid claims.

(v)    In *Fabozzi, et al. v. Lexington Ins. Co., et al.*, 04 CV 4835 (E.D.N.Y.), Lexington is charged with unlawfully refusing to pay sums due to plaintiffs pursuant to their homeowners' insurance policy.  Following a collapse of plaintiffs' building, plaintiffs were forced to vacate the residence and perform substantial repairs to make the residence habitable.  Plaintiffs claim that their policy specifically provided coverage for collapse.

(vi)    In an August 21, 2005 *Washington Post* article entitled "AIG's Other Reputation: Some Customers Say the Insurance Giant Is Too Reluctant to Pay Up," the *Washington Post* outlined numerous examples of AIG's systematic failure to pay valid claims and cited to numerous specific examples in which AIG failed to pay legitimate claims.

    i.    The article stated "Consumer advocates, former customers and their lawyers gripe that AIG has routinely flouted its obligation under state insurance laws to pay legitimate claims promptly and has abused the legal system in fights with customers who sue."

    ii.    Consistent with the claims in the instant matter, the *Washington Post* article cited to "a 2001 affidavit, [from] a former claims supervisor in AIG's San Francisco office alleged in an employment case that beginning in 1983 or 1984, AIG adopted what employees call a 'slow pay' system for claims."

    iii.    The article further referenced an illegal practice that was employed in the instant matter.  "Robert Cook, a supervisor from 1978 to 1985, said that under an AIG 'check-retention policy,' checks owed insureds…were simply locked in a safe until payees complained."

(vii)    The website www.consumeraffairs.com/insurance, listed numerous consumer complaints from 2005 to 2008 relating to AIG and its subsidiary companies' misconduct including but not limited to wrongful denials of claims, insurance adjusters' improper assessments of property damage, and insurance companies' failure to honor obligations as clearly written in their policies.

(viii)    In *Texas v. Allied World Assurance Co.,* Following a settlement with the Texas Attorney General's Office in 2007, Allied World Assurance agreed to pay $2.1 million following charges by the State that Allied unlawfully coordinated bids on excess casualty placements with its principal shareholder AIG, an example of how AIG influenced and controlled subsidiary companies.

(ix)    In *Formosa Plastics Corp. v. ACE Amer. Insur. Co., et al.*, 06 CV 5055 (D.N.J.), Allied World Assurance assumed approximately $15 million of risk liability following plaintiff's purchase of an all risk property insurance policy.  Following an explosion and fire at plaintiff's facility, defendant Allied, along with others, refused to

indemnify or acknowledge a duty to indemnify plaintiff for losses covered under the policy.

22.   In addition to these and other lawsuits and complaints, in the past ten years, the New York State Department of Insurance: Consumer Services Bureau also has received several complaints regarding Defendants Lexington and Allied's misconduct, ranging from disputes over amounts of indemnification and interpretation of policy provisions to delays in payment of claims and other general violations of laws or regulations.

23.   Those complaints and actions, along with the instant action, are mere samples of a history of wrongful conduct on the part of Defendants during which Defendants have systematically and intentionally denied legitimate claims of policyholders, perpetrating a fraud upon the public at large.

24.   In fact, in this specific case, Defendants initially denied and thereafter delayed partial payment of over $600,000 to Plaintiffs, who as a direct result, were required to retain counsel and other outside consultants to advocate proper payment on behalf of Plaintiffs.

25.   As a consequence of Defendants' dilatory tactics and fraudulent adjusting practices and policies to deny significant claims and/or wrongly make lowball settlement offers to settle the valid claims of Plaintiffs, Plaintiffs incurred substantial attorneys' fees, which constituted yet another reasonably foreseeable expense stemming form Defendants' breach of its obligations to its insured under the Policies.

26.   Despite Plaintiffs' efforts to resolve this matter without resorting to litigation, Defendants persisted in denial of their full liability under the Policies, and have attempted to pressure Plaintiffs into accepting a significantly lesser sum than the value of Plaintiffs' assessed and actual property damage.

27.    Defendants, in further obligation of their duties owed to their insureds, attempted to deceive Plaintiffs into signing a proof of loss document that limited Plaintiffs' recovery despite actual knowledge that the Wynn claim had only been partially adjusted, at the time.

28.    Upon information and belief, Defendants have engaged in such behavior to retain the benefits of the premiums of over $100,000.00 per year and the investment or interest return thereon, while fully intending to deny their indemnity obligations under the Policies.

29.    Based on Defendants' bad faith and unfair dealing with Plaintiffs' claim, it is likely that there will be a recovery beyond limits Defendants have allegedly placed upon Plaintiffs' recovery and upon which Defendants will be liable.  Plaintiffs now bring this action for relief.

## AS FOR THE FIRST CAUSE OF ACTION
(Breach of Contract by Defendants)

30.    Plaintiffs repeat, reiterate, re-allege, and incorporate each and every allegation set forth in the entirety of this first amended complaint (both preceding and succeeding allegations), with the same force and effect as though fully set forth fully and at length herein.

31.    There can be no dispute that the Policies cover the losses to the Apartment, its contents and extra expenses incurred as a result of flood.

32.    Nor can there be any dispute that much of the Apartment and the insured property and improvements contained therein were destroyed, damaged or rendered unusable or irreparable by the Flood.

33.    Plaintiffs have fully complied with their obligations under the Policies.  They have paid all premiums due and owing to Defendants.  Plaintiffs have provided Defendants detailed documentary evidence of the Owners' out-of-pocket costs of replacing and, where possible, repairing the items and improvements damaged by the Flood.

34.    Notwithstanding that submission of detailed proof of loss, Defendants thus far have paid less than one third of the money due to Plaintiffs.  Moreover, millions in Costs does not include covered damages stemming from extra expenses and losses incurred, not yet substantiated, but which Plaintiffs intend to prove at trial.

35.    Nevertheless, without any lawful or reasonable justification, the Defendants wrongfully refused to honor their contractual insurance obligations and delayed payment until after Plaintiffs were forced to hire legal counsel.  Defendants further refused to pay to Wynn, at minimum, all of the monies due and owing in out-of-pocket costs and still persist in such wrongful conduct.

36.    Defendants had an obligation under the Policies to implement proper procedures for investigation of claims and to effectuate prompt payment of their liabilities for covered damages.

37.    Defendants failed to adopt such procedures and instead retained an adjuster to assess the claims.  Not surprising, this adjuster and Defendants, upon information and belief, at the instruction of the Defendants and pursuant to an insurance industry common scheme and plan to deny payment on large claims, purported to deny the bulk of Plaintiffs' losses, even though such damages were supported by documentary evidence.  This unfair and improper procedure for claims adjustment breached Defendants' obligations under the Policies.

38.    Defendants have continued their bad faith refusal to pay Wynn the remaining amount of its damages to restore the Apartment to its pre-Flood condition, which is in excess of $3 million.

39.    Moreover, as a direct and proximate result of Defendants' aforesaid wrongful breach of the aforesaid contract, the Owners suffered further economic damages covered under the Policies from loss of use of the Apartment, lost income from the inability to do business there, extra expenses from having to stay elsewhere when in Manhattan to conduct business or otherwise, and additional losses which stem from the vexatious conduct of Defendants.

40.    By virtue of the aforesaid, Plaintiffs have suffered economic loss and damages in the sums exceeding $3 million in an amount to be determined at trial.

## AS FOR THE SECOND CAUSE OF ACTION
(Fraud by Defendants)

41.    Plaintiffs repeat, reiterate, re-allege, and incorporate each and every allegation set forth in the entirety of this first amended complaint (both preceding and succeeding allegations), with the same force and effect as though fully set forth fully and at length herein.

42.    Defendants' rejection of the majority of Wynn's claims was part of a fraudulent scheme by Defendants to avoid their obligations under the Policies, while retaining the benefits of the substantial annual premiums.

43.    In marketing the Policies to and in negotiating the terms of the ALL RISK and other Policies with the Policyholders, Defendants represented to the Policyholders that the Policies would promptly indemnify them, including Wynn, individually, against all risks of

direct physical loss, damage and extra expense that were covered by the Policy and not specifically excluded from coverage.

44.     Implied in these misrepresentations about the scope of coverage, was that the Defendants would implement and maintain a fair and prompt procedure for assessing and paying claims under the Policies.

45.     The misrepresentations made by Plaintiffs were implied during the course of negotiating the Policies, independently of and in addition to any representations regarding obligations arising under the Policies themselves.

46.     Upon information and belief, Defendants knew or should have known that Plaintiffs reasonably believed that they had fair and prompt procedures for payment of claims. Defendants, however, failed to disclose that they lacked such procedures.

47.     Defendants knowingly made these misrepresentations, and knowingly failed to disclose other material facts with the intent of defrauding Wynn out of the annual premiums of over $100,000.00 per year, allowing them to retain the benefit of the interest or investment income thereon, while improperly limiting their liability under the Policy through bad faith restrictions on coverage.

48.     By virtue of its reliance on Defendants' willful misrepresentations, Wynn relied upon the same and purchased insurance from the Defendants and did not seek any other source of coverage for the Apartment, reasonably expecting that the Apartment and its contents and extra expenses were fully insured from losses from the specified perils, including but not limited to flooding.

49.    In addition, Defendants' misrepresentations about the extent of coverage and failures to disclose the unfairness of the assessment procedures reasonably caused Wynn to forebear and delay necessary repairs and remediation, based on the reasonable belief that coverage under the Policies would be forthcoming.  This forbearance caused the Owners to suffer damages and loss of income and forcing them to stay elsewhere while in New York City.

50.    By virtue of the aforesaid, the Plaintiffs have relied upon Defendants' representation and have suffered economic loss and damages in the sums exceeding $3 million and seek punitive damages in an amount to be determined at trial.

## AS FOR THE THIRD CAUSE OF ACTION
(Nevada Declaratory Judgments Act, N.R.S. §30.010, *et seq*.)

51.    Plaintiffs repeat, reiterate, re-allege, and incorporate each and every allegation set forth in the entirety of this first amended complaint (both preceding and succeeding allegations), with the same force and effect as though fully set forth fully and at length herein.

52.    There is a bona fide dispute between the parties regarding Defendants' duties to provide insurance coverage for Wynn's claim under the Policies.

53.    Pursuant to the Nevada Declaratory Judgments Act, as codified in N.R.S. §30.010, *et seq*., there is an actual case and controversy of a justiceable nature.  As such, the Plaintiffs are entitled to a declaration that the Policies require Defendants to provide insurance coverage for their claims.

54.    All persons and entities who have any claim or interest which would be affected by the declaratory relief requested are parties to this action as the subject policies were bound for coverage and delivered to Wynn in Nevada.

14

55.    An award of the declaratory relief is warranted to make certain the rights of the parties.

56.    Wynn has suffered direct and substantial harm and has been prejudiced by Defendants' refusal to provide insurance coverage for the claim under the Policies and, accordingly, Plaintiffs are entitled to a declaration that their claim, as evidenced herein, is to be covered completely by the Policies.

## AS FOR THE FOURTH CAUSE OF ACTION
(Nevada Unfair Insurance Practices Act, N.R.S. §686A.010, *et seq.*)

57.    Plaintiffs repeat, reiterate, re-allege, and incorporate each and every allegation set forth in the entirety of this first amended complaint (both preceding and succeeding allegations), with the same force and effect as though fully set forth fully and at length herein.

58.    Pursuant to the Policies, Defendants were required to provide insurance coverage and to compensate Wynn for all covered losses.

59.    At all relevant times, Defendants were subject to the provisions of the Nevada Unfair Insurance Practices Act, N.R.S. § 686A.010, *et seq.* (the "NUIPA").

60.    Defendants violated the provisions of the NUIPA through their performance of the following prohibited actions and/or omissions:

(a)    Failing to a effectuate prompt, fair, and equitable procedure for payment on a claim in which the liability of Defendants was established by Plaintiffs' submissions;

(b)    Failing to promptly provide Wynn with a reasonable explanation of the basis in the Policies, with respect to the facts of Wynn's claim and the applicable law, for the denial of Wynn's claim; and

(c)    Failing to acknowledge and act reasonably promptly upon communications with respect to the claim arising under the Policies

61.     Defendants' actions and/or inactions as set forth above constitute unfair insurance practices and are therefore in violation of the NUIPA.

## AS FOR THE FIFTH CAUSE OF ACTION
(General Business Law § 349)

62.     Plaintiffs repeat, reiterate, re-allege, and incorporate each and every allegation set forth in the entirety of this first amended complaint (both preceding and succeeding allegations), with the same force and effect as though fully set forth fully and at length herein.

63.     When conducting business and rendering services in New York, Defendants were prohibited by General Business Law § 349 from engaging in deceptive acts or practices.

64.     Defendants sold insurance policies to Plaintiffs and other members of the general public and failed to properly adjust such policies sold to Plaintiff and to others consumers and other individuals in the general public..

65.     Defendants are further governed by regulations including New York Insurance Law § 2601, which prohibits unfair claim settlement practices.

66.     New York Insurance Law § 2601 sets forth certain actions and/or prohibitions governing the conduct of insurers, and enumerates several provisions of unfair settlement practices and regulations that include but are not limited to the following:

(a)     Insurers must not knowingly misrepresent to claimants pertinent facts or policy provisions regarding policy coverage;

(b)     Insurers must not fail to adopt and implement reasonable standards for prompt investigations of claims arising under their policies;

(c)     Insurers must attempt to effectuate prompt, fair, and equitable settlement of claims in good faith;

(d)     Insurers must not compel policyholders to institute suits to recover amounts due under their policies;

67.    Defendants have violated these and other provisions of New York Insurance Law § 2601 and General Business Law § 349.

68.    Defendants knowingly and willfully engaged in recurring deceptive acts and practices in New York, injuring Wynn, when they falsely misrepresented the scope of coverage under the insurance policies and misrepresented and/or withheld material facts relating to the procedure for resolving claims to Plaintiffs, consumers, and the general public.

69.    Similarly, upon information and belief, Defendants knowingly and willfully engaged in a pattern and practice of misleading and injuring other Policyholders, and impacting consumers and the public at large, by falsely misrepresenting material information concerning their policies and the scope of coverage.  Defendants routinely mislead their Policyholders and general consumers by marketing and negotiating policies and coverage that Defendants do not intend to honor, and failing to disclose material information including but not limited to caps on coverage regardless of policy terms.

70.    Defendants' deceptive acts were committed in connection with the providing of consumer-oriented services.  The Policies marketed and issued by Defendants to Plaintiffs were standard policies, the terms of which do not differ in any material way from insurance policies issued to numerous other consumers.  The Policies issued to Plaintiffs were pursuant to Defendants' standard practices, utilized by other Policyholders, and were not preceded by unusually lengthy or substantial negotiations regarding the scope of the Policies or their terms.

71.    Defendants, on more than one occasion, attempted to dupe Plaintiffs to sign a proof of loss document, which would, in essence, dispose of Plaintiffs' valid claims under their Policies.

72.    Defendants market their policies as constituting comprehensive property insurance coverage, the general purpose of which is to provide comprehensive coverage and compensation to Policyholders, including Plaintiffs, in the event of certain specified perils, including but not limited to property damage suffered as a result of floods.

73.    Defendants have acquired the trust and business of numerous consumers who, like Plaintiffs, reasonably relied upon Defendants' representations, not knowing Defendants were engaged in deceptive and fraudulent practices, and paid regular premiums to Defendants for insurance coverage.

74.    Defendants knowingly and willfully prevent Policyholders, including Plaintiffs, from recovering under their legitimate property damage claims by engaging in unlawful practices including, but not limited to, inordinately delaying and denying legitimate claims, willfully ignoring assessments and documentation of property damage and expenses, failing to provide proper justifications for incomplete or non-coverage of claims, and attempting to settle claims at amounts significantly less than the amount Policyholders are entitled under their policies.

75.    Such bad faith misconduct has injured Plaintiffs, other Policyholders, as well as the general public who have or will become victim to Defendants' misconduct as described herein.

76.    Defendants' deceptive and misleading practices affected Policyholders, including Wynn, as well as the general public interest, as Policyholders reasonably relied upon Defendants' representations regarding Policies and the scope of coverage.  As a result of Defendants' misconduct, Policyholders, including Wynn, suffer economic damages and additional losses as a result of their reasonable reliance on Defendants' fraudulent conduct.

18

77.    Defendants' actions and/or inactions as set forth above constitute deceptive acts and practices and are therefore in violation of General Business Law § 349 and New York Insurance Law § 2601.

## AS FOR THE SIXTH CAUSE OF ACTION
(Punitive Damages)

78.    Plaintiffs repeat, reiterate, re-allege, and incorporate each and every allegation set forth in the entirety of this first amended complaint (both preceding and succeeding allegations), with the same force and effect as though fully set forth fully and at length herein.

79.    Defendants knowingly and willfully engaged in egregious tortious misconduct and fraudulent and deceptive acts thereby injuring Wynn and the public generally.

80.    Defendants knowingly and willfully engaged in a pattern of tortious egregious misconduct by fraudulently misrepresenting their policies and the scope of their coverage to Plaintiffs.

81.    Upon information and belief, Defendants' fraudulent misconduct toward Plaintiffs was part of a common scheme and practice by Defendants that was systematically aimed at the public generally, consumers, and purchasers of insurance policies.

82.    Defendants engage in a fraudulent scheme of misrepresenting themselves as providers of comprehensive property insurance policies, who properly investigate claims, provide full coverage owed to their Policyholders under the policies, and advance payments to their Policyholders efficiently and quickly.

83.    Upon information and belief, Defendants knew or should have known that their Policyholders, including Plaintiffs, reasonably relied upon Defendants' representations

regarding their business practices, policies, and respective coverage to their Policyholders' own detriment.

84.    Despite Defendants' representations to their Policyholders, including Wynn, as well as the general public, Defendants engaged in a common scheme of egregious misconduct through actions including but not limited to: unjust delay in assessing property damage, failing to properly analyze Policyholders' claims, making assessments that are significantly contrary to the documented value of property damage, and otherwise failing to follow proper insurance industry protocol in evaluating, processing, and adjusting claims.

85.    Further, Defendants systematically and intentionally deny and/or unjustly limit payments on legitimate claims of Policyholders, including Wynn, which Defendants know to be valid, thereby perpetuating a fraud upon Plaintiffs and the public at large.  For example, despite their representations to Wynn, other Policyholders, and the general public regarding comprehensive coverage, on information and belief, Defendants routinely and fraudulently delay, deny and/or limit their payments on claims in excess of $1 million regardless of their representations or the policies of their insureds.

86.    In addition, Defendants routinely fail to provide reasonable and timely explanations for denial of coverage to their Policyholders, including Wynn, and willfully refuse to honor their contractual obligations through bad faith, unjust enrichment measures such as attempting to settle property claims for amounts significantly lower than the value of the actual damage.

87.    Such misconduct constitutes fraudulent misrepresentations of Defendants' policies and coverage, gross disregard for Defendants' policy obligations, bad faith denials of

coverage, and overall unjust misconduct by Defendants in perpetuating a fraud upon Plaintiffs, other Policyholders, and the public at large.

88.    As a result of Defendants' gross and egregious misconduct, Plaintiffs have sustained significant economic loss stemming from expenditure of increased extra expenses covered under the Policies, and other injuries.

89.    Upon information and belief, other Policyholders, as well as consumers generally, similarly have been misled and/or injured as a result of Defendants' fraudulent, publicly-directed practices.  Indeed, upon information and belief, Defendants have been subject to numerous suits and complaints involving misconduct including but not limited to misrepresentations of and/or failure to honor policies.

90.    Defendants' egregious, fraudulent misconduct rises to a level of criminal indifference and is a public wrong requiring the imposition of punitive damages as vindication.

WHEREFORE, plaintiffs, Steve Wynn, Elaine Wynn, Wynn Resorts Limited, and Wynn Resorts L.L.C., jointly and respectfully request judgment in their favor and an Order against all defendants, including, Lexington Insurance Company and Allied World Assurance Company Holdings, Limited, jointly and severally, in the form of order awarding:

    (a)    A declaration that the Policies provide complete insurance coverage for covered losses incurred by Plaintiffs as a result of the Flood;

    (b)    The entire amount of Wynn's loss under the Policies of at least the over $3 million necessary to restore the Apartment to its pre-Flood condition, plus attorneys' fees and cost of this action;

    (c)    Compensatory damages in an amount to be determined at trial;

    (d)    Consequential damages (including attorneys fees) in an amount to be determined at trial;

(e)     Attorneys' fees and costs of suit,

(f)     Punitive damages;

(g)     A finding of attorneys fees and costs for the time spent by Wynn's agents or employees in seeking its proper recovery against Defendants for the improper conduct as alleged herein;

(h)     An alternative award of statutory damages under Nevada Declaratory Judgments Act, N.R.S. §30.010, *et seq.*;

(i)     An alternative award of statutory damages under Nevada Unfair Insurance Practices Act, N.R.S. §686A.010, *et seq.*;

(j)     Treble damages under New York General Business Law § 349; and

(k)     Any other relief as this Court deems equitable and just.

Dated: April 21, 2008
New York, New York

BUCHANAN INGERSOLL & ROONEY PC

By: _____

Barry I. Slotnick, Esq. (BS 1398)
Stuart P. Slotnick, Esq.(SS 1964)
One Chase Manhattan Plaza, 35th Floor
New York, NY 10005
(212) 440-4400
Attorneys for Plaintiffs
Wynn Resorts Limited, Wynn Resorts L.L.C
Steve Wynn, Elaine Wynn

H. Marc. Tepper, Esq.
1835 Market Street, 14th Floor
Philadelphia, PA 19103-2985
(215) 665-8700
Attorney for Plaintiffs
Wynn Resorts Limited, Wynn Resorts L.L.C
Steve Wynn, Elaine Wynn

22