UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x

STEVEN WYNN, ELAINE WYNN, WYNN RESORTS
LIMITED AND WYNN RESORTS, L.L.C.,

                               Plaintiffs,

             – against –

LEXINGTON INSURANCE COMPANY, and ALLIED
WORLD ASSURANCE COMPANY (US), INC.

                             Defendants.

------------------------------------------------------------------------x

**07 Civ. 7604 (NRB)(MHD)**

**SECOND AMENDED
COMPLAINT**

**JURY TRIAL DEMANDED**

           Plaintiffs, Steve Wynn, Elaine Wynn (collectively referred to herein as

"Owners"), Wynn Resorts Limited ("Wynn Ltd.") and Wynn Resorts L.L.C. ("Wynn LLC")

(the Owners, Wynn Ltd., Wynn LLC are collectively referred to herein as "Wynn" or

"Plaintiffs"), by and through their undersigned attorneys, Buchanan Ingersoll & Rooney PC,

hereby bring this action against defendants, Lexington Insurance Company ("Lexington") and

Allied World Assurance Company (US) Inc. ("Allied") (Lexington and Allied are collectively

referred to herein as "Defendants") and allege as follows:

## INTRODUCTION

           1.      Plaintiffs were forced to bring this action and unnecessarily prosecute this

litigation due to Defendants' fraudulent misrepresentations about their obligations under

certain all-risk insurance policies purchased by Plaintiffs and their unjustifiable and bad faith

refusals to provide Plaintiffs with the bargained-for benefits under those policies. The

policies indemnified Plaintiffs against all losses to an apartment located at 817 Fifth Avenue,

New York, New York resulting from certain specified perils, including but not limited to,

flooding.

2.     In reliance on the Defendants' representations about the scope of coverage, Plaintiffs proceeded to pay exorbitant premiums to Defendants in the amount of over $100,000.00 per year for insurance coverage on the Manhattan apartment and the expensive custom furnishings, personal property, and improvements contained therein.

3.     After a massive flood destroyed or damaged beyond repair much of the apartment and its contents, Defendants have, in bad faith and without justification or excuse, purported to limit their obligations to indemnify Plaintiffs to a mere fraction of the actual cost of restoring the apartment to its pre-flood condition and related extra expenses.

4.     Defendants have paid only a small portion of Plaintiffs' claim, have refused to provide an explanation as to why they have only made partial payments, and have failed to identify what portion of the slight payment applies to which portion of the claim.

5.     Plaintiffs, in reliance on Defendants' misrepresentations, forbore immediate renovation and reparation of the damaged interior and furnishings, causing them to suffer further damages from loss of use, loss of business income, increased extra expenses covered under the policies and possible increased deterioration of the apartment and its furnishings. Defendants' persistence in their bad faith and wrongful denial of coverage, both before and after the filing of this litigation, has left Plaintiffs with no choice but to initiate and continue to prosecute this present action.

**THE PARTIES**

6.     Plaintiffs, Wynn LLC and Wynn Ltd., are Nevada limited liability companies with a principal place of business located in Nevada.

7.     The Owners own shares and are the leaseholders under a proprietary lease in a cooperative apartment building locating at 817 Fifth Avenue, New York, New York (the

"Apartment"). This Apartment serves as the Owners' residence and place of business when they are in New York.

8.    Defendant Lexington is a corporation organized and existing under the laws of Delaware, maintains administrative offices at 100 Summer Street, Boston, Massachusetts 02110, and has a principal place of business at 200 State Street, Boston, Massachusetts 02109.

9.    Defendant Lexington is a member company of American International Group ("AIG") and AIG set, created, and influenced internal policies on payment and adjustment of claims.

10.    Defendant Allied is a Bermuda corporation maintaining its corporate headquarters at 27 Richmond Road, Pembroke HM 08, Bermuda and a United States headquarters located at 225 Franklin Street, 27th Floor, Boston, Massachusetts 02110.

11.    Defendant, Allied was founded in large part by AIG.

12.    AIG was a principal shareholder of defendant Allied, contributed a significant amount of capital toward Allied's creation, and influenced and created Allied's internal policies on payment and adjustment of claims.

13.    At all relevant times, Lexington provided all-risk property insurance coverage on the Apartment, as well the furnishings, personal property, and improvements contained therein to Plaintiffs against certain perils, including, but not limited to, flooding.

14.    At all relevant times, Allied provided all-risk property insurance coverage to Plaintiffs on the Apartment, and its furnishings, personal property, and improvements contained therein against certain specified perils, including, but not limited to, flooding.

15.    At the time Defendants provided coverage to Plaintiffs for the Apartment, they knew that the Apartment was lavishly and extravagantly furnished and renovated and that the

Plaintiffs sought insurance for, *inter alia*, high-end and custom-made furnishings, personal property, and improvements. Indeed, the Defendants were provided with a list of the covered items and their estimated minimum values at the time they issued their policies to Plaintiffs. Thus, there can be no question that the Defendants were aware of the opulence and uses of the Apartment, the value of its contents, and that it would be extremely expensive to replace or repair any item destroyed or damaged as a result of a covered peril.

**STATEMENT OF FACTS**

**THE POLICIES**

16.    For the coverage period of June 22, 2004 through June 22, 2005, Lexington issued ALL RISK INCLUDING FLOOD Insurance Policy No. 1374229 to Wynn Ltd. (*See* the Lexington policy attached as Exhibit "1" and, at times herein, is referred to as the "Lexington Policy").

17.    For the coverage period of June 22, 2004 through June 22, 2005, Allied issued ALL RISK INCLUDING FLOOD Insurance Policy No. AW1374229 to Wynn LLC. (*See* the Allied policy attached as Exhibit "2" and, at times herein, is referred to as the "Allied Policy").

18.     The Lexington and Allied Policies share the risk of insuring the Apartment and its contents, as well as extra expenses such as loss of business income or other damages resulting from certain perils, including flooding (collectively referred to herein as the "Policies"). The Policies were delivered to Nevada, where the primary insureds are principally located.

19.      Under the Policies, Defendants are unquestionably obligated to provide insurance coverage to Wynn for any covered losses to the Apartment, inclusive of losses arising from flood damage, up to an amount of $65,140,787.00.

20.      In reliance on the Defendants' representations about the scope of coverage, at all relevant times, Wynn paid the annual premium of over $100,000.00 under the Policies.

21.      Defendants accepted the premium payments, bound the coverage and, upon information and belief, earned investment or interest income on Wynn's premiums. During this time, Wynn had no reason to suspect that Defendants had no intention of ever paying the full amount of coverage owed under the Policies in the event of a claim.

## THE FLOOD

22.      On or about December 29, 2004, a water pipe in the ceiling of the Apartment burst, causing substantial damage to the furnishings and infrastructure of the Apartment (herein the "Flood"), including total destruction of some items and locations therein.

23.      At the time of the Flood, the Apartment was uninhabited, which resulted in continuous hours of flooding in the Apartment.

24.      Due to the extensive damage sustained to the property and improvements in the Apartment, the Owners were unable to repair completely or satisfactorily the vast majority of the affected items. The Owners thus had no choice but to expend a considerable sum to replace these damaged items and incur extra expenses while conducting business in Manhattan.

25.      Moreover, the Flood was the direct and proximate cause of widespread structural damage to the Apartment's walls, ceiling, and floors – damage that required extensive renovations and remediation to restore the Apartment to its pre-Flood condition.

**DEFENDANTS' WRONGFUL DENIAL OF THE CLAIM**

26.     The Plaintiffs duly submitted documentary evidence of the out-of-pocket costs and other expenses incurred in excess of $3 million to repair and remediate the damaged portions of the Apartment's infrastructure, remove and replace the high-end furnishings and adornments, including but not limited to custom-made wall coverings and carpet, and to restore the Apartment to the opulence and splendor it enjoyed prior to the Flood.

27.     In addition, Plaintiffs intend to demonstrate at trial additional and consequential damages relating to the loss of use of the Apartment, including but not limited to reasonably foreseeable loss of income from the prolonged inhabitability of the Apartment, the extra expenses incurred, attorney, consulting, appraisal and engineering fees, costs, and expenses, and possible increased deterioration of the Apartment from the Defendants' dilatory actions and inaction.

28.     Defendants knew or should have known and foreseen that Plaintiffs would suffer these and other expenses and damages stemming from Defendants' clear breach of their obligations arising under the policy.  Such consequential damages were known and foreseeable to Defendants at the time of, and/or prior to, the contracting of Plaintiffs' Policies, as Defendants were well aware of the uses of Plaintiffs' Apartment for residential and business purposes, as well as the potential damages stemming from any loss or damage thereto or from Defendants' breach of their obligations under the Policies.

29.     Despite Plaintiffs' submission to Defendants of evidence of the out-of-pocket damages resulting from the Flood and detailed information of Plaintiffs' claim, Defendants have wrongfully and improperly refused to honor their contractual liability under the Policies.

30.    Specifically, Defendants wrongfully and unjustifiably delayed and failed to indemnify Wynn for the full amount necessary to restore the Apartment to its pre-Flood condition, let alone for covered extra expenses relating to the Flood, and have improperly and wrongly sought to settle the insurance claim for a sum far below the actual and fair value of the loss for their own financial gain.

31.    The improper and fraudulent conduct of Defendants caused the Plaintiffs to delay renovation in the expectation that payment on the claim would be forthcoming, which it was not. Plaintiffs' reasonable forbearance in remediation caused them to suffer increased damages and extra expense from the inability to utilize the Apartment for business or as a secondary residence.

32.    Moreover, Defendants and Defendants' hired adjusters and representatives failed to follow standard industry practice and procedure in investigating and addressing Plaintiffs' claim. Such bad faith departures from standard industry protocol included, but were not limited to, Defendants' failure to properly conduct inspections to the damaged property and monitor the extensive Flood damage in the Apartment over time, as well as Defendants' willful strategy of turning a blind-eye to destroyed or damaged areas of the Apartment that warranted coverage under the Policies.

33.    The fraudulent conduct engaged in by Defendants is part of a policy and practice of bad faith and fraudulent conduct directed toward the public generally, wherein Defendants engage in a common scheme of marketing themselves, their policies, and coverage without intending to fully honor such representations in the event of a claim. On information and belief, Defendants' intentional failures to properly pay legitimate claims is

7

part of their economic business incentives to save money while perpetuating systematic claims-handling abuses.

34.    Unsurprisingly, Defendants have been subject to numerous complaints and lawsuits involving similar misconduct and other examples of Defendants' bad faith in dealing with their insureds, including but not limited to, other wrongfully-denied claims. Among them, Defendants Lexington and Allied, and their parent company and/or sponsor AIG, are/have been defendants in the following cases and subject to the following complaints:

(i)    In *Hibbets, et al. v. Lexington Ins. Co.*, 07 CV 5169 (E.D.La), a class action lawsuit in the Eastern District of Louisiana, defendant Lexington is charged with systematically, intentionally, and improperly denying thousands of claims of policy owners relating to widespread damage from Hurricane Katrina. (The action is currently stayed, and marked closed for administrative/statistical purposes.)

(ii)    In *Carlisle SoHo East Trust v. Lexington Ins. Co.*, 2008 NY Slip Op 1847, 1 (1st Dept. 2008), Defendant Lexington is charged with wrongfully denying coverage under a general liability and umbrella insurance policy. Defendant Lexington's summary judgment motion, wherein Lexington argued that it did not have a duty to defend or indemnify the plaintiff, was denied, and plaintiffs' cross-motion for summary judgment was granted by the lower court; decision affirmed by the First Department.

(iii)    In *Board of Managers of the 195 Hudson Street Condo. v. Jeffrey M. Brown Associates, Inc., et al.*, 07 CV 4058 (S.D.N.Y.), plaintiff's complaint seeks declaratory judgment against defendant Lexington for its failure to pay on valid claims.

(iv)    In *Fabozzi, et al. v. Lexington Ins. Co., et al.*, 04 CV 4835 (E.D.N.Y.), Lexington is charged with unlawfully refusing to pay sums due to plaintiffs pursuant to their homeowners' insurance policy. Following a collapse of plaintiffs' building, plaintiffs were forced to vacate the residence and perform substantial repairs to make the residence habitable. Plaintiffs claim that their policy specifically provided coverage for collapse.

(v)   In another example of the systematic practice of improper claims adjustment, another AIG unit was found to have engaged in bad faith and was found liable for millions of dollars in punitive damages for, *inter alia*, willfully disregarding insureds' rights to fair claims settlement practices and failing to utilize reasonable standards for prompt investigations. *See United Technologies Corp. v. Amer. Home Assur. Co.*, 118 F.Supp.2d 174 (D. Conn. 2000).

(vi)  In an August 21, 2005 *Washington Post* article entitled "AIG's Other Reputation: Some Customers Say the Insurance Giant Is Too Reluctant to Pay Up," the *Washington Post* outlined numerous specific examples of AIG's systematic failure to pay valid, legitimate claims. *See* Dean Starkman, *AIG's Other Reputation*, Aug. 21, 2005, *at* http://washingtonpost.com/wp-dyn/content/article/2005/08/20/AR2005082000179_pf.html, attached as Exhibit "3."

  i.   The article stated "Consumer advocates, former customers and their lawyers gripe that AIG has routinely flouted its obligation under state insurance laws to pay legitimate claims promptly and has abused the legal system in fights with customers who sue." *Id.*

  ii.  Consistent with the claims in the instant matter, the *Washington Post* article cited to "a 2001 affidavit, [from] a former claims supervisor in AIG's San Francisco office alleged in an employment case that beginning in 1983 or 1984, AIG adopted what employees call a 'slow pay' system for claims." *Id.*

  iii. The article further referenced an illegal practice that was employed in the instant matter. "Robert Cook, a supervisor from 1978 to 1985, said that under an AIG 'check-retention policy,' checks owed insureds…were simply locked in a safe until payees complained." *Id.*

(vii) The website www.consumeraffairs.com/insurance, lists numerous consumer complaints from 2005 to 2008 relating to AIG and its subsidiary companies' misconduct including but not limited to wrongful denials of claims, insurance adjusters' improper assessments of property damage, and insurance companies' failure to honor obligations as clearly written in their policies.

(viii)   In *Texas v. Allied World Assurance Co.,* Allied World Assurance
agreed to a settlement payment of $2.1 million in 2007 following
charges by the Texas Attorney General's Office that Allied
unlawfully coordinated bids on excess casualty placements with its
principal shareholder AIG, an example of how AIG influenced and
controlled subsidiary companies.

(ix)   In *Formosa Plastics Corp. v. ACE Amer. Insur. Co., et al.*, 06 CV
5055 (D.N.J.), Allied World Assurance assumed approximately
$15 million of risk liability following plaintiff's purchase of an all
risk property insurance policy.  Following an explosion and fire at
plaintiff's facility, defendant Allied, along with others, refused to
indemnify or acknowledge a duty to indemnify plaintiff for losses
covered under the policy.

22.     In addition to these and other lawsuits and complaints, in the past ten years, the
New York State Department of Insurance: Consumer Services Bureau also has received
several complaints regarding Defendants Lexington and Allied's misconduct, ranging from
disputes over amounts of indemnification and interpretation of policy provisions to delays in
payment of claims and other general violations of laws or regulations.

23.     Those complaints and actions, along with the instant action, are mere samples
of a history of wrongful conduct on the part of Defendants during which Defendants have
systematically and intentionally denied legitimate claims of policyholders, perpetrating a
fraud upon the public at large.

24.     In fact, in this specific case, Defendants delayed partial payment of
approximately $600,000 to Plaintiffs, who as a direct result, were required to expend
unnecessary counsel fees and fees for other outside consultants to advocate proper payment
on behalf of Plaintiffs.

25.     As a consequence of Defendants' dilatory tactics, fraudulent adjusting
practices, and policies to deny significant claims and/or wrongly make lowball settlement

offers to settle the valid claims of Plaintiffs, Plaintiffs incurred substantial attorneys' fees, which constituted yet another reasonably foreseeable expense stemming from Defendants' breach of their obligations to their insured under the Policies.

26.     Despite Plaintiffs' efforts to resolve this matter without resorting to litigation, Defendants persisted in denial of their full liability under the Policies, and have attempted to pressure Plaintiffs into accepting a significantly lesser sum than the value of Plaintiffs' assessed and actual property damage.  Such behavior is consistent with Defendants' history of improperly adjusting claims.

27.     Defendants, in further violation of their obligations and duties owed to their insureds, attempted to deceive Plaintiffs into signing a proof of loss document that limited Plaintiffs' recovery despite actual knowledge that the Wynn claim had only been partially adjusted at the time.

28.     Upon information and belief, Defendants have engaged in such behavior to retain the benefits of Plaintiffs' premiums of over $100,000.00 per year and the investment or interest return thereon, while fully intending to deny their indemnity obligations under the Policies.

## DEFENDANTS' BAD FAITH REFUSAL TO EXPLAIN CLAIM PAYMENTS AND DENIED PORTIONS OF CLAIM

29.     Plaintiffs have made repeated written and oral requests that Defendants provide them with an itemization and explanation of Defendants' claim payments made to Plaintiffs, as well as explanations for portions of Plaintiffs' claim that were denied.

30.     Plaintiffs demanded this information on numerous occasions, including by letters to Defendants dated June 23, 2008, August 8, 2008, and August 27, 2008. *See* Letter

from Slotnick to Herrington, dated June 23, 2008, attached as Exhibit "4"; Letter from Slotnick to Marino, dated Aug. 8, 2008, attached as Exhibit "5"; Letter from Slotnick to Herrington and Marino, dated Aug. 27, 2008, attached as Exhibit "6."

31.    Plaintiffs' August 8, 2008 correspondence provided Defendants with an line-item spreadsheet, wherein Plaintiffs requested that Defendants provide corresponding explanations for each part of the claim that was paid or denied; Defendants still have not responded to that request.

32.    In addition, Plaintiffs' insurance broker, Patrick McGinley, also requested the information in a June 30, 2008 letter to Defendants' insurance company representative, Anne O'Connor, as well as via additional follow-up correspondence. *See* Letter from McGinley to O'Connor, dated June 30, 2008, attached as Exhibit "7."

33.    By letter to Plaintiffs dated July 16, 2008, Defendants referred Plaintiffs to non-responsive documents previously exchanged between the parties. Those documents included Proof of Loss Statements indicating lump sum payments made to Plaintiffs without any information or explanation as to what and how the payment amounts were allocated.

34.    Defendants continue in their refusal to provide the requested basic explanation of claim adjustment and to properly respond to follow-up inquiries from Plaintiffs and Mr. McGinley regarding this information.

35.    Defendants' refusal to provide itemizations and explanations for partial payments and denied portions of Plaintiffs' claim has proved to Plaintiffs that Defendants are attempting to conceal their intentional and significant underpayment of Plaintiffs' claim.

36.    Such intentional and significant underpayment is highlighted in a review of the partial payments made to Plaintiffs to date. Specifically, of the approximately $800,000 paid

to Plaintiffs to date (out of a more than $3 million claim), Defendants allocated approximately $600,000 to carpet and wall covering expenses and refused to explain the allocation of the remaining $200,000 payment.

37.     Defendants would have Plaintiffs believe that the remaining unspecified payment of approximately $200,000 purportedly covers *all* demolition, construction, architect fees, repair, and replacement of damaged property and custom furnishings, including the replacement of Plaintiffs' destroyed electronic/audio visual system, which in and of itself valued approximately $185,000.

38.     Defendants' continued refusal to provide explanations for their prior partial claim payments made to Plaintiffs, as well as their denial of unspecified portions of Plaintiffs' claim, has prevented Plaintiffs from being able to determine what damaged property Defendants agree and refuse to cover under the Policies and to define the coverage issues in this matter.

39.     Moreover, such refusal has obstructed Plaintiffs ability to evaluate this matter for settlement and has forced Plaintiffs to expend additional time, resources, and expenses in repeatedly seeking such information from Defendants.

## DEFENDANTS' BAD FAITH DEMAND FOR AN APPRAISAL FORCES MORE UNNECESSARY LITIGATION

40.     Defendants' bad faith tactics to force the unnecessary expenditure of time, resources, expenses, and legal intervention, as well as to delay litigation and claim payments due to Plaintiffs, was also apparent in their demand that Plaintiffs submit to an appraisal and Defendants' motion practice regarding the same.

41.     By letter to Plaintiffs dated October 15, 2007, submitted more than 2 ½ years after the Flood, Defendants demanded for the first time that Plaintiffs submit to an appraisal regarding the underlying insurance claim.  Defendants also proceeded in May 2008 to file a motion to compel an appraisal and to stay discovery in the instant action, which was ultimately denied by the Court.

42.     Defendants were well-aware at the time of their demand that not only was destroyed or damaged property from Plaintiffs' flooded Apartment removed and discarded and reconstruction complete, but also that there were fundamental coverage and other legal issues that rendered any appraisal improper.

43.     Nonetheless, Defendants forced Plaintiffs and the Court into expending additional time, resources, and expenses by engaging in unnecessary motion practice, thereby delaying litigation and additional claim payments owed to Plaintiffs.

44.     Based on Defendants' bad faith and unfair dealing with Plaintiffs' claim, it is likely that there will be a recovery beyond limits Defendants have allegedly placed upon Plaintiffs' recovery and upon which Defendants will be liable.  Plaintiffs now bring this action for relief.

## AS FOR THE FIRST CAUSE OF ACTION
(Breach of Contract by Defendants)

45.     Plaintiffs repeat, reiterate, re-allege, and incorporate each and every allegation set forth in the entirety of this second amended complaint (both preceding and succeeding allegations), with the same force and effect as though fully set forth fully and at length herein.

46.     There can be no dispute that the Policies cover the losses to the Apartment, its contents and extra expenses incurred as a result of flood.

14

47.     Nor can there be any dispute that much of the Apartment and the insured property and improvements contained therein were destroyed, damaged, or rendered unusable or irreparable by the Flood.

48.     Plaintiffs have fully complied with their obligations under the Policies.  They have paid all premiums due and owing to Defendants.  Plaintiffs have provided Defendants detailed documentary evidence of the Owners' out-of-pocket costs of replacing and, where possible, repairing the items and improvements damaged by the Flood.

49.     Notwithstanding that submission of detailed proof of loss, Defendants thus far have paid less than one third of the money due to Plaintiffs.  Moreover, the millions in costs owed to Plaintiffs does not include covered damages stemming from extra expenses and losses incurred, and not yet substantiated, but which Plaintiffs intend to prove at trial.

50.     Nevertheless, without any lawful or reasonable justification, the Defendants wrongfully refused to honor their contractual insurance obligations and delayed payment until after Plaintiffs were forced to hire legal counsel.  Defendants further refused to pay to Wynn, at minimum, all of the monies due and owing in out-of-pocket costs and still persist in such wrongful conduct.

51.     Defendants had an obligation under the Policies to implement proper procedures for investigation and adjustment of claims and to effectuate prompt payment of their liabilities for covered damages.

52.     Defendants failed to adopt such procedures and instead retained an adjuster to assess the claims.  Not surprising, this adjuster and Defendants, upon information and belief, at the instruction of the Defendants and pursuant to an insurance industry common scheme and plan to deny payment on large claims adopted by Defendants, purported to deny the bulk

of Plaintiffs' losses, even though such damages were supported by documentary evidence.
This unfair and improper procedure for claims investigation and adjustment breached
Defendants' obligations under the Policies and caused additional damages that the Policies
were purchased to protect against in the first place.

53.    Defendants have continued their bad faith refusal to pay Plaintiffs the
remaining amount of their damages to restore the Apartment to its pre-Flood condition, which
is in excess of $3 million.

54.    Moreover, as a direct and proximate result of Defendants' aforesaid wrongful
breach of the aforesaid contract, the Owners suffered further economic damages covered
under the Policies from loss of use of the Apartment, lost income from the inability to do
business there, extra expenses from having to stay elsewhere when in Manhattan to conduct
business or otherwise, and additional losses which stem from the vexatious conduct of
Defendants.

55.    By virtue of the aforesaid, Plaintiffs have suffered economic loss and damages,
including consequential damages, in the sums exceeding $3 million in an amount to be
determined at trial.

## AS FOR THE SECOND CAUSE OF ACTION
(Fraud by Defendants)

56.    Plaintiffs repeat, reiterate, re-allege, and incorporate each and every allegation
set forth in the entirety of this second amended complaint (both preceding and succeeding
allegations), with the same force and effect as though fully set forth fully and at length herein.

57.     Defendants' rejection of the majority of Wynn's claims was part of a policy, practice, and fraudulent scheme by Defendants to avoid their obligations under the Policies, while retaining the benefits of the substantial annual premiums for their own financial gain.

58.     In marketing the Policies to and in negotiating the terms of the ALL RISK and other Policies with the Policyholders, Defendants represented to the Policyholders that the Policies would promptly indemnify them, including Wynn, individually, against all risks of direct physical loss, damage and extra expense that were covered by the Policy and not specifically excluded from coverage.

59.     Implied in these misrepresentations about the scope of coverage, was that the Defendants would implement and maintain a fair and prompt procedure for assessing and paying claims under the Policies.

60.     The misrepresentations made by Defendants were implied during the course of negotiating the Policies, independently of and in addition to any representations regarding obligations arising under the Policies themselves.

61.     Upon information and belief, Defendants knew or should have known that Plaintiffs reasonably believed that they had fair and prompt procedures for payment of claims. Defendants, however, failed to disclose that they lacked such procedures in furtherance of their own economic business incentives.

62.     Defendants knowingly made these misrepresentations, and knowingly failed to disclose other material facts with the intent of defrauding Wynn out of the annual premiums of over $100,000.00 per year, allowing them to retain the benefit of the interest or investment

income thereon, while improperly limiting their liability under the Policies through bad faith restrictions on coverage and systematic claims-handling abuses.

63.    By virtue of their reliance on Defendants' willful misrepresentations, Plaintiffs relied upon the same and purchased insurance from the Defendants and did not seek any other source of coverage for the Apartment, reasonably expecting that the Apartment, its contents, and extra expenses were fully insured from losses from the specified perils, including but not limited to flooding.

64.    In addition, Defendants' misrepresentations about the extent of coverage, failures to disclose the unfairness of the assessment procedures, as well as failures to disclose exactly what property they have or intend to cover or deny under the Policies and explanations in connection thereto, reasonably caused Wynn to forebear and delay necessary repairs and remediation, based on the reasonable belief that coverage under the Policies would be forthcoming.  This forbearance caused the Owners to suffer damages, loss of income, and other expenses, and forced them to stay elsewhere while in New York City.

65.    By virtue of the aforesaid, the Plaintiffs have relied upon Defendants' misrepresentations, have suffered economic loss and damages in the sums exceeding $3 million, and seek punitive and other damages in an amount to be determined at trial.

### AS FOR THE THIRD CAUSE OF ACTION
(Nevada Declaratory Judgments Act, N.R.S. §30.010, *et seq.*)

66.    Plaintiffs repeat, reiterate, re-allege, and incorporate each and every allegation set forth in the entirety of this second amended complaint (both preceding and succeeding allegations), with the same force and effect as though fully set forth fully and at length herein.

67.    There is a bona fide dispute between the parties regarding Defendants' duties to provide insurance coverage for Wynn's claim under the Policies.

68.    Pursuant to the Nevada Declaratory Judgments Act, as codified in N.R.S. §30.010, *et seq.*, there is an actual case and controversy of a justiceable nature.  As such, the Plaintiffs are entitled to a declaration that the Policies require Defendants to provide insurance coverage for their claims.

69.    All persons and entities who have any claim or interest that would be affected by the declaratory relief requested are parties to this action as the subject policies were bound for coverage and delivered to Wynn in Nevada.

70.    An award of the declaratory relief is warranted to make certain the rights of the parties.

71.    Wynn has suffered direct and substantial harm and has been prejudiced by Defendants' refusal to provide insurance coverage for the claim under the Policies and, accordingly, Plaintiffs are entitled to a declaration that their claim, as evidenced herein, is to be covered completely by the Policies.

## AS FOR THE FOURTH CAUSE OF ACTION
(Nevada Unfair Insurance Practices Act, N.R.S. § 686A.010, *et seq.*)

72.    Plaintiffs repeat, reiterate, re-allege, and incorporate each and every allegation set forth in the entirety of this second amended complaint (both preceding and succeeding allegations), with the same force and effect as though fully set forth fully and at length herein.

73.    Pursuant to the Policies, Defendants were required to provide insurance coverage and to compensate Wynn for all covered losses.

74.    At all relevant times, Defendants were subject to the provisions of the Nevada

Unfair Insurance Practices Act, N.R.S. § 686A.010, *et seq.* (the "NUIPA").

75.    Defendants violated the provisions of the NUIPA through their performance of

the following prohibited actions and/or omissions:

> (a)    Failing to a effectuate prompt, fair, and equitable procedure for payment on a claim in which the liability of Defendants was established by Plaintiffs' submissions;
>
> (b)    Failing to promptly provide Wynn with a reasonable explanation of the basis in the Policies, with respect to the facts of Wynn's claim and the applicable law, for the denial of Wynn's claim; and
>
> (c)    Failing to acknowledge and act reasonably promptly upon communications with respect to the claim arising under the Policies

76.    Defendants' actions and/or inactions as set forth above constitute unfair

insurance practices and are therefore in violation of the NUIPA.

## AS FOR THE FIFTH CAUSE OF ACTION
(General Business Law § 349)

77.    Plaintiffs repeat, reiterate, re-allege, and incorporate each and every allegation

set forth in the entirety of this second amended complaint (both preceding and succeeding

allegations), with the same force and effect as though fully set forth fully and at length herein.

78.    When conducting business and rendering services in New York, Defendants

were prohibited by General Business Law § 349 from engaging in deceptive acts or practices.

79.    Defendants sold insurance policies to Plaintiffs, other consumers, and other

members of the general public, and had a policy and practice of failing to properly investigate,

adjust, and make proper payments on such policies sold.

80.    Defendants are further governed by regulations including New York Insurance

Law § 2601, which prohibits unfair claim settlement practices.

81.    New York Insurance Law § 2601 sets forth certain actions and/or prohibitions governing the conduct of insurers, and enumerates several provisions of unfair settlement practices and regulations that include, but are not limited to, the following:

(a)    Insurers must not knowingly misrepresent to claimants pertinent facts or policy provisions regarding policy coverage;

(b)    Insurers must not fail to adopt and implement reasonable standards for prompt investigations of claims arising under their policies;

(c)    Insurers must attempt to effectuate prompt, fair, and equitable settlement of claims in good faith;

(d)    **Insurers must not compel policyholders to institute suits to recover amounts due under their policies;**

82.    11 N.Y.C.R.R. § 216, *et seq.*, also governs unfair claims settlement practices and claim cost control measures by setting forth practice principles for all insurers and defining certain minimum standards that insurers must follow.  These include, but are not limited to, the following:

(a)    Insurers must have as their basic goal the *prompt* and *fair* settlement of all claims;

(b)    **Insurers must assist the claimant in the processing of a claim;**

(c)    **Insurers must *clearly* inform the claimant of the insurer's position regarding any disputed matter;**

*See* 11 N.Y.C.R.R. § 216.0(e); *see also* 11 N.Y.C.R.R. § 216.6(e) ("In any case where there is no dispute as to one or more elements of a claim, payment for such element(s) shall be made notwithstanding the existence of disputes as to other elements of the claim where such payment can be made without prejudice to the other part.").

83.    Defendants have violated these and other provisions of New York Insurance Law § 2601, 11 N.Y.C.R.R. § 216, *et seq.*, and General Business Law § 349.

84.    Defendants knowingly and willfully engaged in recurring deceptive acts and practices in New York, injuring Wynn, when they falsely misrepresented the scope of coverage under the insurance policies and misrepresented and/or withheld material facts relating to the procedure for resolving claims to Plaintiffs, consumers, and the general public.

85.    Similarly, upon information and belief, Defendants knowingly and willfully engaged in a pattern and practice of misleading and injuring other Policyholders, and impacting consumers and the public at large in the State of New York, by falsely misrepresenting material information concerning their policies and the scope of coverage. Defendants routinely mislead their Policyholders and general consumers by marketing and negotiating policies and coverage that Defendants do not intend to honor, and failing to disclose material information including but not limited to caps on coverage regardless of policy terms.

86.    Defendants' deceptive acts were committed in connection with the providing of consumer-oriented services.  The Policies marketed and issued by Defendants to Plaintiffs were standard policies, the terms of which do not differ in any material way from insurance policies issued to numerous other consumers.  The Policies issued to Plaintiffs were pursuant to Defendants' standard practices, utilized by other Policyholders, and were not preceded by unusually lengthy or substantial negotiations regarding the scope of the Policies or their terms.

87.    Defendants, on more than one occasion, attempted to dupe Plaintiffs to sign a proof of loss document, which would, in essence, dispose of Plaintiffs' valid claims under their Policies.

88.    Defendants market their policies as constituting comprehensive property insurance coverage, the general purpose of which is to provide comprehensive coverage and compensation to Policyholders, including Plaintiffs, in the event of certain specified perils, including but not limited to property damage suffered as a result of floods. Defendants further market that they provide "rapid, efficient claims response."

89.    Defendants have acquired the trust and business of numerous consumers who, like Plaintiffs, reasonably relied upon Defendants' representations and are lulled into believing that Defendants are looking out for them with comprehensive insurance coverage and fair and reasonable claim adjustment practices and procedures. These consumers, like Plaintiffs, pay regular premiums to Defendants for insurance coverage, not knowing that Defendants are engaged in deceptive and fraudulent practices.

90.    Defendants knowingly and willfully prevent Policyholders, including Plaintiffs, from recovering under their legitimate insurance claims by engaging in unlawful practices including, but not limited to, inordinately delaying and denying legitimate claims and willfully ignoring assessments and documentation of property damage and expenses. Moreover, Defendants intentionally engage in bad faith practices of failing to provide proper justifications for incomplete or non-coverage of claims; Defendants fail to provide their insureds with reasonable explanations and justifications for their claims payments or lack thereof. Defendants' bad faith misconduct is all in an attempt to settle claims at amounts significantly less than the amount Policyholders are entitled under their policies.

91.    Such bad faith misconduct has injured Plaintiffs, other Policyholders, as well as the general public who have or will become victim to Defendants' misconduct as described herein.

92.     Defendants' deceptive and misleading practices affected Policyholders, including Wynn, as well as the general public interest, as Policyholders reasonably relied upon Defendants' representations regarding policies and the scope of coverage.  As a result of Defendants' misconduct, Policyholders, including Wynn, suffer economic damages and additional losses as a result of their reasonable reliance on Defendants' fraudulent conduct.

93.     Defendants' actions and/or inactions as set forth above constitute deceptive acts and practices and are therefore in violation of General Business Law § 349, New York Insurance Law § 2601, and 11 N.Y.C.R.R. § 216, *et seq.*

### AS FOR THE SIXTH CAUSE OF ACTION
(Punitive Damages)

94.     Plaintiffs repeat, reiterate, re-allege, and incorporate each and every allegation set forth in the entirety of this second amended complaint (both preceding and succeeding allegations), with the same force and effect as though fully set forth fully and at length herein.

95.     Defendants knowingly and willfully engaged in egregious tortious misconduct and fraudulent and deceptive acts thereby injuring Wynn and the public generally.

96.     Defendants knowingly and willfully engaged in a policy and practice of tortious egregious misconduct by fraudulently misrepresenting their policies, the scope of their coverage, and claims handling practices and procedures to Plaintiffs.

97.     Upon information and belief, Defendants' fraudulent misconduct toward Plaintiffs was in furtherance of Defendants' economic incentives and part of a Defendants' institutional scheme and practice that was systematically aimed at the public generally, consumers, and purchasers of insurance policies.

98.     Defendants engage in a fraudulent scheme of misrepresenting themselves as providers of comprehensive property insurance policies, who properly investigate claims, provide full coverage owed to their Policyholders under the policies, and advance payments to their Policyholders efficiently and quickly.

99.     Upon information and belief, Defendants knew or should have known that their Policyholders, including Plaintiffs, reasonably relied upon Defendants' representations regarding their business practices, policies, and respective coverage to their Policyholders' own detriment.

100.    Despite Defendants' representations to their Policyholders, including Wynn, as well as the general public, Defendants engaged in a common scheme of egregious misconduct through actions including but not limited to: unjust delay in assessing property damage, failing to properly analyze Policyholders' claims, making assessments that are significantly contrary to the documented value of property damage, and otherwise failing to follow proper insurance industry protocol in evaluating, processing, and adjusting claims.

101.    Further, Defendants systematically and intentionally deny and/or unjustly limit payments on legitimate claims of Policyholders, including Wynn, which Defendants know to be valid, thereby perpetuating a fraud upon Plaintiffs and the public at large.  For example, despite their representations to Wynn, other Policyholders, and the general public regarding comprehensive coverage, on information and belief, Defendants routinely and fraudulently delay, deny, and/or limit their payments on claims in excess of $1 million regardless of their representations or the policies of their insureds, and in stark contravention to their advertisements in which Defendants pride themselves in providing industry-leading limits exceeding tens and/or hundreds of millions of dollars in claims coverage.

102.    In addition, Defendants routinely fail to provide reasonable and timely explanations for denial of coverage to their Policyholders, including Wynn, and willfully refuse to honor their contractual obligations through bad faith, unjust enrichment measures such as attempting to settle property claims for amounts significantly lower than the value of the actual damage.

103.    Such misconduct constitutes fraudulent misrepresentations of Defendants' policies and coverage, gross disregard for Defendants' policy obligations, a pattern of bad faith denials of coverage and refusals to provide explanations thereof, and overall unjust misconduct by Defendants in perpetuating a fraud upon Plaintiffs, other Policyholders, and the public at large.

104.    As a result of Defendants' gross and egregious misconduct, Plaintiffs have sustained significant economic loss stemming from expenditure of increased extra expenses covered under the Policies, and other injuries.

105.    Upon information and belief, other Policyholders, as well as consumers generally, similarly have been misled and/or injured as a result of Defendants' fraudulent, publicly-directed practices.  Indeed, upon information and belief, Defendants have been subject to numerous suits and complaints involving misconduct including, but not limited to, misrepresentations of and/or failure to honor policies.

106.    Defendants' egregious, fraudulent misconduct rises to a level of criminal indifference and is a public wrong requiring the imposition of punitive damages as vindication.

WHEREFORE, plaintiffs, Steve Wynn, Elaine Wynn, Wynn Resorts Limited, and Wynn Resorts L.L.C., jointly and respectfully request judgment in their favor and an Order against all defendants, including, Lexington Insurance Company and Allied World Assurance Company Holdings, Limited, jointly and severally, in the form of order awarding:

(a)    A declaration that the Policies provide complete insurance coverage for covered losses incurred by Plaintiffs as a result of the Flood;

(b)    The entire amount of Wynn's loss under the Policies of at least the over $3 million necessary to restore the Apartment to its pre-Flood condition, plus attorneys' fees and cost of this action;

(c)    Compensatory damages in an amount to be determined at trial;

(d)    Consequential damages (including attorneys fees) in an amount to be determined at trial;

(e)    Attorneys' fees and costs of suit,

(f)    Punitive damages;

(g)    A finding of attorneys' fees and costs for the time spent by Wynn's agents and employees in seeking their proper recovery against Defendants for the improper conduct as alleged herein;

(h)    An alternative award of statutory damages under Nevada Declaratory Judgments Act, N.R.S. § 30.010, *et seq.*;

(i)    An alternative award of statutory damages under Nevada Unfair Insurance Practices Act, N.R.S. § 686A.010, *et seq.*;

(j)    Treble damages under New York General Business Law § 349;

(k)    Damages under New York Insurance Law § 2601 and 11 N.Y.C.R.R. § 216, *et seq.*, and

(l)     Any other relief as this Court deems equitable and just.

Dated: September 10, 2008
New York, New York

BUCHANAN INGERSOLL & ROONEY PC

By: _____
        Barry I. Slotnick, Esq.
        Stuart P. Slotnick, Esq.
        Anna N. Fretel, Esq.
        620 Eighth Avenue, 23rd Floor
        New York, NY 10018-1669
        (212) 440-4400

        Attorneys for Plaintiffs
        Wynn Resorts Limited, Wynn Resorts L.L.C
        Steven Wynn, and Elaine Wynn

28